*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CT-955

JEROME BRADLEY, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CTF-5276-10)

(Hon. Frederick J. Sullivan, Magistrate Judge)
(Hon. Florence Y. Pan, Associate Judge)

(Argued January 8, 2013                    Decided January 22, 2015)

*George Weiss*, with whom *Stephen F. Brennwald* was on the brief, for appellant.

*John J. Woykovsky*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Rosalynn Calbert Groce*, Deputy Solicitor General, were on the brief and supplemental brief, for appellee.

*James Klein* and *Samia Fam*, Public Defender Service, filed an *amicus curiae* brief on behalf of appellant.

Before EASTERLY and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

EASTERLY, *Associate Judge*: "[S]entencing is a critical stage of a criminal trial; to a criminal defendant, perhaps the most important."[1]  The goal is to have the punishment fit the individual defendant and the crime he committed.  That goal is not served when a sentencing judge relies on a mistaken understanding of a defendant's criminal history.

In this case, Jerome Bradley was convicted of driving without a license,[2] operating a vehicle after revocation or suspension,[3] reckless driving,[4] operating an all-terrain vehicle on public property,[5] and fleeing from the scene of an accident.[6]  The charges arose from an incident in which Mr. Bradley lost control of the all-terrain vehicle he was driving on a city street and hit a pedestrian.  After finding Mr. Bradley guilty, the magistrate judge immediately proceeded to sentencing and made a number of remarks about Mr. Bradley that lacked adequate support, either in the trial record, or in documents available on CourtView[7] that the magistrate

---

[1]  *United States v. Hamid*, 531 A.2d 628, 643 (D.C. 1987).

[2]  D.C. Code § 50-1401.01 (d) (2001).

[3]  D.C. Code § 50-1403.01 (e) (2001).

[4]  D.C. Code § 50-2201.04 (b) (2001).

[5]  D.C. Code § 50-2201.04b (a) (2005 Supp.).

[6]  D.C. Code § 50-2201.05 (a)(1) (2001) (repealed 2013).

[7]  CourtView is the Superior Court's electronic docketing system.

judge subsequently identified, after a record remand, as the basis for his sentencing determination.

With this opinion we reaffirm that "[m]isinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *United States v. Hamid*, 531 A.2d 628, 644 (D.C. 1987) (quoting *United States v. Malcolm*, 432 F.2d 809, 816 (2d Cir. 1970)) (emphasis omitted). We also reinforce principles of transparency and make clear that if a sentencing court is considering extra-record information about a defendant in CourtView, i.e., pleadings and documents associated with other cases, the court must disclose that fact to the parties and make those documents part of the record. Applying these principles to this case, we hold that Mr. Bradley's right to due process at sentencing was violated. Thus, although we affirm his conviction, we vacate his sentence and remand for resentencing.

## I.      Facts and Procedural History

In the early evening hours on March 24, 2010, Mr. Bradley was driving an all-terrain vehicle ("ATV") on 8th Street Southeast when he came head-to-head with a police car. Mr. Bradley veered around the police car, lost control of the ATV, and drove over the curb and into a group of people standing on the other side of the street. The ATV hit Julius Mgongo, who flipped over the vehicle and suffered a broken leg. After the accident, Mr. Bradley ran, and the police caught up to him a few blocks away.

Mr. Bradley's case was tried before a magistrate judge in a single afternoon. With no pause in the proceedings, the magistrate judge heard testimony from the police, Mr. Mgongo, a number of bystanders, and Mr. Bradley;[8] heard closing arguments; and found Mr. Bradley guilty of all charges.

---

[8] Before Mr. Bradley testified, the government stated that it intended to impeach him with certified records for three criminal convictions; but the prosecutor only elicited bare admissions that Mr. Bradley had two convictions: a 2008 conviction for possession of cocaine, and another conviction (no date specified) for carrying a pistol without a license. The government elicited no testimony about the sentences Mr. Bradley received for these convictions.

Immediately after announcing his verdict, the magistrate judge asked the government if it wanted "to get a presentence report" or to submit a victim impact statement; the magistrate judge acknowledged, however, that "it sounds like the victim has made peace with Mr. Bradley here." The government responded that it was "ready to proceed with sentencing now" and saw no "need for a presentence report." The magistrate judge then offered to order a presentence report if defense counsel wished one to be generated, but indicated that Mr. Bradley would be locked up pending sentencing, or, as the magistrate judge put it, Mr. Bradley was "going to jail tonight, right now." Counsel responded, "then we better proceed today."

The magistrate judge directed the government to make its sentencing recommendation. The prosecutor requested a sentence of at least six months of jail time. In support of this request the prosecutor quickly reviewed what the government considered to be the salient facts: that Mr. Mgongo suffered a broken leg which required surgery; Mr. Bradley had run from the scene of the accident; Mr. Bradley had prior convictions, including "run-ins with the law around drug[s] and guns"; and Mr. Bradley was on probation at the time of the accident.

Defense counsel and Mr. Bradley spoke next, with counsel representing that Mr. Mgongo did not want Mr. Bradley to go to jail, and Mr. Bradley explaining that he had apologized to Mr. Mgongo and had tried to help him out financially. Mr. Bradley also explained that he needed to keep working at his autobody business to support his wife and three children.

The magistrate judge then said the following:

> THE COURT: All right, Mr. Bradley, I have listened to you. I listened to the evidence here. It's now 20 minutes of 6:00. I don't like putting people in jail. I really don't. The system has been really kind to you, see, and I don't know where you get this attitude that the system's against you and every police are[] against you, but the system's been very, very kind to you. That last charge that you were charged with, the 30-year, you could have gone to jail for about 40 years, 60 years maybe, I don't know, and Judge Jackson gave you probation. Took a chance that Mr. Bradley's going to do right, and what happens, he almost kills a guy while he's on a probation, almost kills a guy. That's the pay, pay back that Judge Jackson got for being kind to you.
>
> Now, the buck stops here. I'm not going to be kind because I don't, you've engaged in risky conduct your whole life, selling drugs, being around guns, fleeing from the police. It's all right here. It's a picture of Jerome Bradley as we know him, and today the words out of your mouth would even confirm my suspicions. You have no regard for anybody but yourself. You're only telling me this because you just don't want to go to jail, but you're not going to fool me. I know you and unfortunately I can't put you away for longer than I can

because I would, because I truly believe you're a danger to society. I truly believe that you're going to go back out there, no matter how much time I give you, you're going to sell your drugs, you're going, you're going to shoot somebody, you're going to probably cause a lot of problems for innocent people, but I can only do what I can do here.

MR. BRADLEY: Can I say one thing?

THE COURT: And I say that – wait a second. You're telling me what a good guy you are, but I got your alleged probation violation report here. As of this writing, this is, by the way this writing was in March of 2010. As of this writing the defendant has not completed his community service hours. The judge spared you, the system spared you 40 years in jail and you didn't do your community service hours to pay them back, a few lousy hours.

[DEFENSE COUNSEL]: Your Honor, he had just –

THE COURT: The defendant, wait a second, hold on a second. On 3/1/2010 the offender submitted a water-loaded specimen. He's trying to fool the probation officer about his drug usage. The defendant has tested positive for cocaine, and then he goes out and he does what he did here. So, it wasn't just this even that's caused you to be in trouble with Judge, Judge Jackson and your probation.

Having thus sketched this "picture of Jerome Bradley as we know him," the magistrate judge concluded, "[s]o, I don't have any sympathy whatsoever." The magistrate judge then sentenced Mr. Bradley to the maximum imprisonment or fine permitted for a total of eighteen months incarceration and $2,000 in fines.

Mr. Bradley filed a Motion for Judicial Review of Trial Court's Judgment under Super. Ct. Crim. R. 117 (g)(1). He argued that the evidence was insufficient to support his reckless driving conviction. He also argued that he was improperly cut off from allocuting. Lastly, he argued that the magistrate judge made "improper and unfounded comments about [him] at the time of sentencing," and that it was not clear what information the magistrate judge had reviewed before sentencing, but whatever it was, the magistrate judge's comments had no foundation and could only be attributable to judicial bias. As a consequence, Mr. Bradley argued, he received an overly harsh sentence for "offenses that, although serious, are basic traffic offenses."

An associate judge of the Superior Court considered Mr. Bradley's motion and rejected his challenges to his conviction and sentence. Specifically with respect to Mr. Bradley's challenge to the magistrate judge's sentencing determination, the associate judge acknowledged that "some of the words used by Magistrate Judge Sullivan at the sentencing hearing were ill chosen." The associate judge elaborated,

> To be sure, the [trial] court made some statements that were overstated and exaggerated: it declared that it believed that defendant was going to "sell drugs" and "shoot somebody" upon release. It also averred (inaccurately) that defendant had "almost killed a guy" while on probation. These words were ill chosen, and if

> read literally, were not based on any evidence in the record. Defendant had not previously been convicted of selling drugs or shooting anyone; and the court was certainly aware that Mr. Mgongo had not, in fact, almost died from being struck by the ATV.

Nonetheless the associate judge concluded that "a fair reading of the sentencing transcript does not reveal any improper prejudice or bias on the part of the trial judge" and discerned no reversible error in the imposition of Mr. Bradley's sentence. Mr. Bradley appealed the associate judge's ruling to this court.

After hearing oral argument, this court retained jurisdiction but remanded the record to the Superior Court for identification of any and all documents the magistrate judge relied upon in making his sentencing determination. In response, the associate judge transmitted to this court a one-paragraph statement from the magistrate judge. In that statement the magistrate judge explained that the parties had "requested immediate sentencing following the trial; therefore, no pre-sentence report was prepared." He further stated that he had "no present recollection of particular documents he relied upon for his sentencing determination." Even so, the magistrate judge recalled that he had "studied the Defendant's juvenile and criminal history by examining images of documents contained in CourtView; a total of 16 juvenile and adult criminal matters," and that these "records contained numerous complaints, indictments, petitions, affidavits, probation violation reports,

pleadings and images of other documents which the Court reviewed." An accompanying statement by the associate judge noted, however, that there were only 15 juvenile and adult criminal matters on CourtView as of the date of Mr. Bradley's sentencing in this case, and that only seven of these matters (one of which was this case) had any corresponding documents that could be viewed in CourtView. The associate judge transmitted to this court the documents available in CourtView related to these seven matters, which amounted to 68 pages in all.

The volume of Mr. Bradley's records perhaps suggests a more serious criminal history than Mr. Bradley in fact possesses. After weeding out dismissed charges and matters that appear to have proceeded no further than an arrest, these records document four convictions from two incidents, both in 2008. The first incident resulted in convictions for felony carrying a pistol without a license[9] and misdemeanor possession of cocaine,[10] for which Mr. Bradley received consecutive sentences of twelve months' incarceration (suspended except for four months) and 180 days' incarceration (suspended) respectively, as well as concurrent terms of one year of supervised release and probation. The second incident resulted in convictions for felony fleeing from a law enforcement officer and misdemeanor

---

[9] D.C.Code § 22-4504 (2001).

[10] D.C. Code § 48-904.01 (d) (2001).

assault on a police officer for colliding with a police vehicle, for which Mr. Bradley received consecutive sentences of twelve months' incarceration (suspended except for six months) and 120 days' incarceration (suspended except for seven days) respectively, as well as one year of supervised release and one year of probation.

Upon review of these supplemental record materials, this court ordered the parties to file supplemental briefs[11] addressing three questions:

1. Did the trial court's statements that Mr. Bradley (a) had "engaged in risky conduct his whole life, selling drugs, being around guns, fleeing the police"; (b) was "going to sell . . . drugs"; (c) was going to "shoot somebody"; (d) "could have gone to jail for 40 years, 60 years maybe" but had instead received probation; and (e) "almost kills a guy while he's on a probation" run afoul of this court's and the Supreme Court's precedent that a defendant's right to Due Process is violated if he is sentenced based on "misinformation or misunderstanding that is materially untrue regarding a prior criminal record or material false assumptions as to any facts relevant to sentencing"? *United States v. Hamid*, 531 A.2d 628, 644 (D.C. 1987); *see Townsend v. Burke*, 334 U.S. 736, 741 (1948) (a sentencing determination based on "assumptions concerning [a defendant's] criminal record which [are] materially untrue . . . is inconsistent with due process of law.").

---

[11] PDS was invited to participate in this case as *amicus* in this court's supplemental briefing order; Mr. Bradley subsequently moved to adopt the arguments made in PDS's brief.

2. In conducting an inquiry under *Hamid* and *Townsend* regarding the foundation for a trial court's sentencing determination, should this court take into account whether documents establish prior criminal conduct by a preponderance of the evidence? *See United States v. Watts*, 519 U.S. 148, 156 (1997).

3. Was it permissible for the sentencing judge to consider information in court records from other cases without identifying on the record for the parties which records it was considering and without formally making those records part of the record in this case?

Supplemental briefs have been filed and we now resolve this case.


## II.   ANALYSIS


### A. Scope of Review


We begin by clarifying the scope of our review. In our system, magistrate judges may conduct certain non-jury criminal proceedings. *See* D.C. Code § 11-1732 (j)(5) (2012 Repl.); Super. Ct. Crim. R. 117 (c). While judgment by a magistrate judge is final for the purposes of the parties, D.C. Code § 11-1732 (j)(5); *see Arlt v. United States*, 562 A.2d 633, 634-35 (D.C. 1989), it is not final for the purposes of this court. Rather, any "appeal to the District of Columbia Court of Appeals may be made only after a judge of the Superior Court has reviewed the order or judgment." D.C. Code § 11-1732 (k) (2012 Repl.). A defendant initiates this review by filing a motion pursuant to Super. Ct. Crim. R.

117 (g)(1), which provides that an associate judge reviewing the order or judgment of a magistrate judge has plenary authority to "affirm, reverse, modify, or remand, in whole or in part, . . . and enter an appropriate order or judgment." *Id.* We have held that, "absent extraordinary circumstances," a defendant "ordinarily" must present in his Rule 117 (g) motion "all the issues to be raised [on appeal] or else forego their consideration later by this court." *Dorm v. United States*, 559 A.2d 1317, 1318 (D.C. 1989).

Mr. Bradley did not seek review in Superior Court of one of the issues he seeks to raise on appeal to this court:  his argument that his conviction must be overturned because his cross-examination of a witness was improperly constricted. Because of the very short time within which a Rule 117 (g) motion must be filed, we construe Mr. Bradley's motion "more generously than we might otherwise for an indication that the issues raised on appeal were noted below." *See Dorm*, 559 A.2d at 1318.  Nevertheless, because Mr. Bradley made only passing reference in the factual summary section of his Rule 117 (g) motion to a ruling by the magistrate judge limiting his ability to "further confirm" a point of impeachment of a particular witness, and then said nothing about this ruling in his legal argument, we cannot say that Mr. Bradley gave any indication that he believed that the

magistrate judge's ruling limiting cross-examination was reversible error (as he now argues to this court). Therefore, we do not address this claim.[12]

With respect to Mr. Bradley's two remaining and related claims on appeal—that the magistrate judge's sentencing determination was based on material misinformation indicative of bias and that Mr. Bradley was prevented from fully allocuting at sentencing—the government argues that our review is restricted to plain error. But Mr. Bradley raised these claims in his Rule 117 (g) motion in Superior Court, and in that forum, the government did not argue these claims were unpreserved. We have held in other contexts that the government may waive "waiver" as an argument on appeal. *See, e.g.*, *In re T.L.,* 859 A.2d 1087, 1090 n.6 (D.C. 2004). Here, we are mindful of the fact that Mr. Bradley's appeal

---

[12] In the heading for this argument in his appellate brief to this court, Mr. Bradley asserts that the magistrate judge's "refusal to permit full cross-examination" of this witness "was plain error." But the body of his brief contains no discussion of the plain error test. Assuming that a demonstration of plain error constituted "extraordinary circumstances" so as to permit appellate review notwithstanding a failure to raise such a claim in a Rule 117 (g) motion, *see Dorm*, 559 A.2d at 1318, Mr. Bradley has failed to develop any argument that the plain error standard was met in this case. *See Hensley v. District of Columbia Dep't of Emp't Servs.*, 49 A.3d 1195, 1206 (D.C. 2012) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citation and quotation marks omitted); *see also Stone v. Alexander*, 6 A.3d 847, 853 (D.C. 2010) (concluding that an argument was not properly before the court where appellant "fail[ed] to develop [it] any further than listing it in a section heading").

is taken from the order of an associate judge,[13] who has full authority to "affirm, reverse, modify or remand in whole or in part the magistrate judge's order or judgment and enter an appropriate order of judgement.[14] We are also mindful of our previous pronouncements that "the plain error rule is not meant to be punitive; instead its purpose is to allow the trial judge [to] fully . . . consider issues and thereby avoid potential error, and to afford prosecutors the opportunity to present evidence on the issue raised." *Williams v. United States*, 966 A.2d 844, 847 (D.C. 2009) (internal quotation marks omitted). Accordingly, we determine that where a defendant raises an issue in a motion for judicial review under Rule 117 (g), the government does not advocate for plain error review in Superior Court, and an associate judge conducts a plenary review of the merits of defendant's claim, we will not restrict our appellate review to plain error.

Lastly, we note that, although we are reviewing the associate judge's denial of Mr. Bradley's Rule 117 (g) motion, we do not defer to the associate judge's

---

[13] *See Bratcher v. United States*, 604 A.2d 858, 861 (D.C. 1992) (explaining that when a defendant appeals a magistrate judge's order or judgment after first seeking review under Rule 117 (g), "[t]hat appeal . . . is taken not from the [magistrate judge's] ruling but from the Superior Court judge's final order or judgment" (quoting *Arlt*, 562 A.2d at 635)); *see also* D.C. Code § 11-721 (a)(1) (2012 Repl.).

[14] Super. Ct. Crim. R. 117 (g)(1).

assessment of Mr. Bradley's claims. Our review and the associate judge's review are the same,[15] and our focus therefore must be on what the record reflects the magistrate judge said and did.

We turn now to examine Mr. Bradley's preserved challenge to the sentencing procedure in this case.

### B. Mr. Bradley's Sentencing

On appeal to this court, Mr. Bradley challenges the "trial judge's improper and unfounded comments about [a]ppellant at the time of sentencing," and alleges a violation of his due process rights. Although Mr. Bradley ascribes bias to the magistrate judge, the foundation of his argument on appeal is, as it was in his Rule 117 (g) motion in Superior Court, that "the [magistrate] judge's comments, if taken

---

[15] *See* Super. Ct. Crim. R. 117 cmt. ("The standard of review of a magistrate judge's decision pursuant to subparagraphs (g)(1) and (2) is the same as applied by the Court of Appeals on appeal of a judgment or order of the Superior Court.").

literally, were not based on anything in the record."[16]  We sought and obtained

supplemental briefing on that issue, and we review that claim.[17]

## 1.  The Nature of the Claim and the Standard of Review

Preliminarily we acknowledge that, ordinarily, "this court does not review

sentences for substantive reasonableness."  *Saunders v. United States*, 975 A.2d

165, 167 (D.C. 2009).  "This does not mean, of course, that the sentencing process

. . . is immune from appellate scrutiny."  *Matter of L.J.*, 546 A.2d 429, 434-35

(D.C. 1988) (providing examples of some of the defects in the sentencing process

---

[16]  In his motion for review, Mr. Bradley asserted that a number of the magistrate judge's statements at sentencing were "inappropriate, improper, and shocking, as they are not based on any evidence in the court's possession or in the record."  Although Mr. Bradley attempted to attach an improper motive—bias—to the magistrate judge's actions, the government, in its opposition to Mr. Bradley's Rule 117 (g) motion, understood that Mr. Bradley's challenge to the record foundation for the magistrate judge's statements could serve as an independent basis to invalidate his sentence.  It addressed this argument separately in its pleading, acknowledged case law holding that the due process clause is violated if the sentencing judge "relie[d] on information or assumptions that are 'materially false,'" and asserted that the magistrate judge had relied on "permissible considerations."  Thus the associate judge ruling on Mr. Bradley's Rule 117 (g) motion was aware of the due process implications when she determined there was no reversible error in the imposition of Mr. Bradley's sentence.

[17]  We do not address Mr. Bradley's bias claim other than to observe that we, like the reviewing court, see no manifestation of improper prejudice or bias on this record.

that this court reviews). The standard by which we review sentencing procedures varies based on the measure of discretion given to the court under the circumstances. For example, we review for abuse of discretion a sentencing court's denial of a request for a continuance, which is intimately related to a court's discretionary management of its docket. *See, e.g.*, *Wheeler v. United States*, 977 A.2d 973, 991-92 (D.C. 2009). We also afford a sentencing court considerable discretion in marshalling the factual foundation for a sentence; a court "may examine any reliable evidence, including that which was not introduced at trial, and may consider a wide range of facts concerning a defendant's character and his crime." *Caldwell v. United States*, 595 A.2d 961, 966 (D.C. 1991) (internal citation and quotation marks omitted). But "this discretion has some limitations arising from the constitutional guarantee of due process"; in particular, "due process is violated when the sentencing judge relies on "material false assumptions as to any facts relevant to sentencing." *Id.* at 967 (quoting *Hamid,* 531 A.2d at 644).[18]

---

[18] *See Harris v. United States*, 612 A.2d 198, 208 (D.C. 1992) (similarly acknowledging due process limitations on a sentencing court's exercise of discretion and citing *United States v. Tucker*, 404 U.S. 443, 446 (1972)).

We explained in *Hamid* that "[n]o [judge] can make valid judgments without knowledge of the facts," 531 A.2d at 645 (quoting *Malcolm*, 432 F.2d at 819), and that "[f]air administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion." *Id.* (concluding that a court may not "rely on mistaken information or baseless asumptions") (internal citation and quotation marks omitted). As support for this pronouncement, we relied on *United States v. Tucker*, 404 U.S. 443, 447 (1972) (distinguishing between a sentence based on informed discretion and one "founded at least in part upon misinformation of constitutional magnitude"), and *Townsend*, 334 U.S. at 741 (observing that "whether caused by carelessness or design," a sentencing determination based on inaccurate information "is inconsistent with due process of law").

*Hamid* examined a sentencing court's reliance on misinformation in the context of reviewing a trial court's grant of writ of error *coram nobis*; thus it did not address the standard of review that would apply on direct review of such claims. We have, in other contexts, observed that "[w]e review fundamental legal errors in the sentencing process . . . *de novo.*" *Dalton v. United States*, 58 A.3d 1005, 1015 (D.C. 2013) (internal quotation marks omitted) (affirming that it

violates due process to enhance a defendant's sentence as a punishment for exercising his right to go to trial). But this court, in *Caldwell*, stated without further exposition that we reviewed for abuse of discretion the appellant's claim that the sentencing court had "relied on the prosecutor's recitation of unsworn evidence, unverified statements of persons unavailable for cross-examination, and incidents of assault which were never adjudicated and which appellant denied but had no opportunity to rebut." 595 A2d at 966. This court then determined that there was adequate information in the presentence report and in the defendant's own sentencing memorandum on which the sentencing court could have legitimately relied and that the defendant had "an adequate opportunity to rebut the substance of the prosecutor's recitation." *Id.* at 967-68. *Caldwell* leads us to conclude that a sentencing-based-on-misinformation claim presents a mixed question of law and fact that requires "unmixing." *See Simms v. United States*, 41 A.3d 482, 486 (D.C. 2012). In this case, that means we examine whether there is information in the record that reasonably supported the magistrate judge's statements at sentencing, and then, in light of that determination, we consider *de novo* whether Mr. Bradley's due process rights were compromised at sentencing.[19]

---

[19] This appears to be the analytic structure used in *Wallace v. United States*, 936 A.2d 757, 780 (D.C. 2007). After explaining that a defendant making a sentencing-based-on-misinformation claim "must prove that the sentencing judge

(continued…)

## 2. Whether the magistrate judge's statements at Mr. Bradley's sentencing were adequately supported

The magistrate judge described Mr. Bradley as an inveterate gun-wielding, drug-dealing criminal who had managed to evade any real consequences for his actions. But, as the government conceded in supplemental briefing, that portrait lacked an adequate foundation in the record evidence.[20]

---

(…continued)
actually relied on the unreliable evidence," it concluded that the trial court's statements at sentencing were well supported by "a substantial amount of uncontested information and uncontested evidence presented during the sentencing hearing and during prior proceedings" and thus that the court's statements at sentencing did not "reflect[] an abuse of discretion *or* den[y] appellant due process." *Id.* at 780-81 (emphasis added).

[20] Because we determine that the trial court's statements about Mr. Bradley were not reasonably supported in the record by any measure, we need not address the question on which we ordered additional briefing, i.e., whether, in conducting an inquiry under *Hamid* and *Townsend*, this court should assess whether a defendant's prior criminal conduct has been proved by a preponderance of the evidence. Thus, we need not resolve whether *United States v. Watts*, 519 U.S. 148, 157 (1997) (holding that proof of a prior acquitted charge by a preponderance of the evidence satisfies due process and allows its consideration at sentencing) overruled this court's decision in *Powers v. United States*, 588 A.2d 1166, 1172 (D.C. 1991) (holding that "reliable evidence" of a prior uncharged crime, not "a preponderance of the evidence or any other evidentiary standard," allows its consideration at sentencing). We note, however, that both the government and *amicus* (whose arguments Mr. Bradley adopted, *supra* note 11) agree that, to comply with due process, the standard of proof is, at a minimum, a preponderance of the evidence.

The magistrate judge said that Mr. Bradley had "engaged in risky conduct [his] whole life, selling drugs, being around guns, fleeing from the police," a statement that the reviewing associate judge recognized as "overstated and exaggerated." Mr. Bradley was thirty years old at the time of his sentencing in 2010 and his four 2008 convictions—a felony and misdemeanor each from two discrete incidents—were his only priors.[21] These convictions coupled with his convictions in this case do not adequately support a statement that Mr. Bradley had been "selling drugs" and had been "around guns" his "whole life."[22]

The magistrate judge further observed, "no matter how much time I give you, you're going to sell your drugs, you're going, you're going to shoot somebody." But as the reviewing associate judge noted, not only had Mr. Bradley never been convicted of selling drugs, there also was no indication that Mr. Bradley had ever used or attempted to use a gun to threaten or injure anyone.

---

[21] The CourtView records that the magistrate judge later identified as a foundation for his statements show a number of other arrests and charges, but either there is no information about the disposition of these charges or the records indicate that these charges were dismissed. Such entries, on their own, do not establish the commission of prior criminal conduct.

[22] Even if we assume the court meant Mr. Bradley's whole adult life, we do not think the court's statement is supported by the two prior incidents on Mr. Bradley's record (the first of which occurred when he was approximately 28 years old), coupled with his conviction in this case.

Although Mr. Bradley's prior possession of a gun was illegal, carrying a pistol without a license is a far cry from assault with a dangerous weapon. In fact, the government never specifically pressed the point that Mr. Bradley was a dangerous person. Rather, the prosecutor argued that Mr. Bradley deserved jail time because he had "had run-ins with the law around drug[s] and guns, which are not small potatoes," and his past convictions showed "disregard for police officers and for their orders." Mr. Bradley's single prior conviction for drug possession, in conjunction with his present convictions related to illegally and recklessly driving an ATV, did not provide an adequate foundation for a prediction that he would sell drugs in the future. Nor did his single conviction for illegal possession of a gun, either alone or in conjunction with his past or present convictions, reasonably support the judge's prediction that Mr. Bradley would shoot someone in the future.

Lastly, the magistrate judge determined that Mr. Bradley was a bad apple who had duped the judge in his 2008 cases and had gotten off too easily. The magistrate judge asserted that Mr. Bradley "could have gone to jail for about 40 years, 60 years maybe, I don't know, and Judge Jackson gave you probation." But that statement has no record foundation, as the government volunteered at oral argument. As a result of his 2008 convictions, Mr. Bradley was required to serve an aggregate of 10 months in jail; he was not merely given probation. Perhaps

more importantly, he never faced anything approaching 40 to 60 years of prison time on the charges for which he was convicted.[23] By our calculation, the maximum sentence the court could have imposed in 2008, if it had thought Mr. Bradley was the worst of offenders (and there is no record evidence that it did), was approximately eleven years imprisonment,[24] and we note, as we are certain that the sentencing court in the 2008 cases did, that Mr. Bradley was accepting responsibility and pleading guilty. Thus, as the government has conceded, the magistrate judge vastly overstated Mr. Bradley's sentencing exposure in his 2008 cases and erroneously understood the sentences Mr. Bradley had received to be unduly lenient.[25]

---

[23] Particularly in the absence of further information, it would have been unreasonable for the magistrate judge to consider the charges for which Mr. Bradley had not been convicted; those charges obviously could not have defined Mr. Bradley's potential sentencing exposure.

[24] The two felonies, carrying a pistol without a license and fleeing from a law enforcement officer, both carry maximum sentences of five years. D.C. Code § 22-4504 (a)(1) (2001); D.C. Code § 50-2201.05b (b)(2) (2005 Supp.). And the two misdemeanors, assault on a police officer and drug possession, carry maximum sentences of 180 days. D.C. Code § 22-405 (b) (2001); D.C. Code § 48-904.01 (d)(1) (2001).

[25] The magistrate judge, also noted that Mr. Bradley "almost kills a guy while he's on a probation, almost kills a guy." As the associate reviewing judge acknowledged, however, the magistrate judge "was certainly aware that Mr. Mgongo had not, in fact, almost died from being struck by the ATV." Indeed, although Mr. Mgongo had to have surgery, followed by physical therapy, to repair his broken leg, the record contained no testimony that Mr. Mgongo was ever near death, and, in fact, the government had "no papered" the charge for aggravated

(continued…)

### 3. Whether Mr. Bradley's due process rights were violated

Having determined that the magistrate judge's statements at sentencing contained a number of unfounded assertions regarding Mr. Bradley, we consider whether Mr. Bradley's due process rights were violated. We conclude they were, for two, interrelated reasons.

To begin with, "courts must be concerned . . . when the sentencing process [has] created a significant *possibility* that misinformation infected the decision." (internal citation and quotation marks omitted). Here there can be no question that the magistrate judge's unfounded statements were material to his decision-making. *See Hamid*, 531 A.2d at 644. Indeed, the reason the magistrate judge made these statements was to explain why he, unlike the judge who had sentenced Mr. Bradley

---

(…continued)
assault, a charge that requires the defendant to cause serious bodily injury to another person. *See* D.C. Code § 22-404.01 (2001).

Nevertheless, we acknowledge the possibility that the magistrate judge meant to say that Mr. Mgongo "could have died" as a result of the accident. *Caldwell*, 595 A.2d at 967-68 (finding permissible judge's statement at sentencing that the victim "could have died" even though victim never went to the hospital for her injuries). And if that is what the magistrate judge meant, we would not question such an assessment of the severity of the injury that a pedestrian could suffer as the result of being hit by an ATV, and ultimately of the riskiness of Mr. Bradley's conduct driving an ATV in the District.

in 2008, was "not going to be kind." The magistrate judge announced that "the buck stops here," and that Mr. Bradley was "not going to fool [him]." Rather, the magistrate judge asserted he "knew" Mr. Bradley and that he had "a picture of Jerome Bradley as we know him." And it was with that "picture" in mind that the magistrate judge sentenced Mr. Bradley, expressing disappointment that he could not "put [Mr. Bradley] away for longer . . . because [he] would." For this reason alone, remand for resentencing is thus necessary.

In addition, a due process violation warranting remand arises from the record in this case, or, more to the point, from the lack of a record—a condition that was only cured by this court's order of a record remand. The magistrate judge failed to document his reliance on extra-record information, namely, Mr. Bradley's records in CourtView. Although the magistrate judge was unable to recall, by the time of the record remand, which CourtView records in particular he relied upon, he represented to this court that he had "studied" the entirety of Mr. Bradley's "juvenile and criminal history." We can only conclude that this study at least contributed to the magistrate judge's inaccurate portrait of Mr. Bradley; meanwhile, Mr. Bradley was left entirely in the dark about the source of the court's information about him and was unable to correct the court's mistaken understanding of his criminal history. Indeed, unaware that the magistrate judge

had an extra-record source of information, Mr. Bradley could only make sense of the magistrate judge's sentencing statements by ascribing bias to the magistrate judge.

It is fortuitous that this court even ordered a record remand, as it is not obvious from the trial transcript that the magistrate judge examined materials outside the trial record, other than an alleged violation report that the magistrate judge referenced in passing in rendering Mr. Bradley's sentence.[26]  We presume that the magistrate judge did not review Mr. Bradley's CourtView records prior to issuing his verdict[27] and this case went directly from verdict to sentencing without

---

[26]  The only express reference in the trial record to this document is the magistrate judge's statement,"[y]ou're telling me what a good guy you are, but I got your alleged probation violation report here."

It is not evident that Mr. Bradley's trial counsel (who did not represent Mr. Bradley in his 2008 cases) either possessed a copy of this report prior to sentencing or knew that the magistrate judge had a copy and would be relying on information therein to make his sentencing determination.  Rather, in his Rule 117 (g) motion, Mr. Bradley expressed some uncertainty about the identity of the document to which the magistrate judge had referred.  We possess a copy of this report only because the government, in the proceedings before Judge Pan, first moved to supplement the record with this document and then, in conjunction with its initial briefing to this court, moved to include it in the appellate record.

[27]  The magistrate judge had no apparent, legitimate cause to do so (e.g., to assess a detention ruling or to rule on an evidentiary issue at trial), and it would have been inappropriate for him to prepare for sentencing before an adjudication of Mr. Bradley's guilt.  *See* Super. Ct. Crim. R. 32 (b)(1) (a trial court may not look at presentence reports until after the defendant "has pleaded guilty, or nolo contendere, or has been found guilty," unless the defendant gives consent on the record to such inpection); *see also Gregg v. United States*, 394 U.S. 489, 491-92

(continued…)

any break in the proceedings. The court opted not to order a presentence report[28] and gave no indication that it needed more information beyond that which had been presented at trial to make an informed sentencing decision.

This court ordered a record remand only because it seemed improbable that the record available to us had served as the basis for the magistrate judge's harsh statements about Mr. Bradley. The trial transcript[29] reflected only that Mr. Bradley had one felony conviction for CPWL and one misdmeanor conviction for possession of cocaine, *see supra* note 8, and the alleged violation report referenced only one additional felony, fleeing a law enforcement officer. Accordingly, we deemed it necessary to direct the magistrate judge to identify any and all

(…continued)

(1969) ("To permit the ex parte introduction of this sort of material to the judge who will pronounce the defendant's guilt or innocence or who will preside over a jury trial would seriously contravene the ... purpose [of Criminal Rule 32] of preventing possible prejudice from premature submission of the presentence report."); *In re D.M.*, 993 A.2d 535, 542 (D.C. 2010) (expressing concern about pre-adjudication review of a probation report in a case where the trial judge also sits as finder of fact: "This was dangerous.").

[28] We acknowledge that the magistrate judge consulted with the prosecutor and defense counsel, but, pursuant to Super. Ct. Crim. R. 32, it is the court's decision whether to order a presentence report.

[29] The transcript was the entirety of the trial record prior to the litigation concerning the Rule 117 (g) motion.

documents he had relied upon to see if adequate support for his sentencing statements in fact existed.

But by ordering such a record remand, we did not mean to imply that it was acceptable for the magistrate judge to examine extra-record CourtView documents without identifying them and without making them part of the record in this case. And we now clarify that the magistrate judge should not have done this.

We have previously acknowledged that a "defendant has the right to be informed of [the] information" a trial court considers "in evaluating the appropriate sentence for a defendant." *Foster v. United States*, 615 A.2d 213, 220-21 (D.C. 1992). This right is intertwined with a defendant's right to allocute and speak to the issue of appropriate punishment, a right which is acknowledged by statute[30] and court rule,[31] but ultimately is "a fundamental one which implicates the due process clause." *Warrick v. United States*, 551 A.2d 1332, 1334 (D.C. 1988). In

---

[30]  D.C. Code § 23-103 (a) (2012 Repl.) (requiring that "prior to imposing sentence" the trial court "shall afford counsel an opportunity to speak on behalf of the defendant and shall address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment").

[31]  Super. Ct. Crim. R. 32 (c)(1) (at sentencing defendant's counsel shall be given the opportunity to address the court and "present any information in mitigation of punishment").

order to have a meaningful opportunity to allocute, a defendant must know what information is under consideration. Likewise, a defendant's ability to seek a sentence correction or reduction via Super. Ct. Crim. R. 35 or appellate review by this court may be compromised if the information that the sentencing court relied upon in making its sentencing determination is not part of the record. *See Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979) ("[T]he act of compiling and preserving a factual record enables the reviewing court to determine whether the decision-maker's choice was both reasonable and proper in the specific factual context.").

We acknowledge that the extra-record documents consulted by the magistrate judge in this case were located in the Superior Court's own electronic filing system; and we do not question that a court may take judicial notice of these records,[32] even though Rule 32 suggests the better course is to allow Court

---

[32] *See Daniels v. United States*, 33 A.3d 324, 330 (D.C. 2011) (concluding that the trial judge did not "err in taking judicial notice of the Superior Court's electronic records database, CourtView, in determining Mr. Daniels' release status. CourtView is the modern equivalent of the case jacket. [I]t has long been settled that a court may take judicial notice of its own records, which is precisely what the trial court did here") (internal quotation marks omitted).

Of course, beyond court records and matters that are properly the subject of judicial notice, there are limits on a court conducting its own investigation of

(continued…)

Services and Offender Supervision Agency (CSOSA)[33] to compile this information for the court. *See infra* at note 37; *see also Harrison v. United States,* 76 A.3d 826, 833 (D.C. 2013) (cautioning that taking judicial notice of court records *sua sponte* "may create an appearance of partiality"). What is objectionable is for a court to take judicial notice of CourtView records *sub silentio*. *Cf. Harrison,* 76 A.3d at 833 (where court took judicial notice of court records, "the procedures employed . . . were fair": "[t]he trial court disclosed the facts that were being noticed, explained why, and gave appellant an opportunity to contest those facts"); FED. R. EVID. 201 (e) (entitling a party upon request "to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed," thus assuming that the court will notify the parties that judicial notice is being contemplated or has been taken). This limitation on the court's review of CourtView materials is critical, because even court records may contain inaccurate or incomplete information. And accurate records can be misinterpreted or misunderstood.

---

(…continued)
matters related to sentencing. *See Belton v. United States*, 581 A.2d 1205, 1214-15 (D.C. 1990).

[33] Rule 32 refers to the Social Services Division, but sentencing information is now compiled by CSOSA. D.C. Code § 24-133 (b)(2)(H) (2012 Repl.).

Indeed, this is precisely what happened in this case. *See supra*.[34] It is also precisely what happened in *Townsend,* a case we relied on heavily in *Hamid*.[35] While the Supreme Court in *Townsend* acknowledged that "[f]air prosecutors and conscientious judges sometimes are misinformed" and that not all mistakes give rise to constitutional concerns, the Court held that the due process violation in that case stemmed from appellant's inability (there caused by a lack of counsel[36]) to "take[] steps to see that the conviction and sentence were not predicated on misinformation or misreading of court records . . . ." 334 U.S. at 741. This, according to the Court, was "a requirement of fair play." *Id.* In our view, the same requirement of fair play required the sentencing court here to identify the CourtView records consulted and to make them a part of the record.[37]

---

[34] It is a mystery when exactly the magistrate judge "studied" the 68 pages of documents available on CourtView regarding Mr. Bradley. But his examination could only have been quick and cursory, given that there were no apparent breaks in the proceedings from the beginning of trial to the pronouncement of sentence.

[35] As we recounted in *Hamid*, 531 A.2d at 644, "[t]he sentencing judge in *Townsend* read aloud a list of eight convictions, passing sentence in reliance thereon too quickly for the uncounseled defendant to object that, in fact, in two of the cases he had been found not guilty, and that the charge at the basis of a third 'conviction' had indeed been dismissed."

[36] *Townsend* was decided prior to *Gideon v. Wainwright*, 372 U.S. 335 (1963).

[37] The principles of due process that undergird this rule of transparency are reflected in Rule 32. Subsection (b) spells out when CSOSA must conduct a presentence investigation and report, or at least generate documentation of the defendant's prior criminal record, for use by the parties and the court at sentencing.

(continued…)

In short, we conclude that Mr. Bradley's due process rights were violated both because the magistrate judge relied on misinformation in making its sentencing determination and because the magistrate judge failed to disclose and make a record of the extra-record information in CourtView that it erroneously thought provided a foundation for its sentencing determination.[38]

### C. Mootness

The government suggested for the first time at oral argument that any challenge to Mr. Bradley's sentencing determination is moot because Mr. Bradley has already served his jail sentence. "Although we, unlike the federal courts, are not bound by the 'case or controversy' requirement of Article III of the

---

(…continued)

That rule does not expressly address cases, such as this one, in which guilt of a misdemeanor is ascertained and sentencing is conducted on the same day. Nonetheless, it would be contrary to the spirit of Rule 32 to conclude that judges may consult any extra-record information they like, without informing the parties, in sentencing proceedings that immediately follow a misdemeanor trial or a guilty plea.

[38] Because we resolve Mr. Bradley's case on this basis, we need not address Mr. Bradley's separate argument that his right to allocute was compromised in this case by the magistrate judge's refusal to let him respond to and challenge the magistrate judge's unfounded sentencing statements.

Constitution, we have adopted this requirement for prudential reasons, and therefore we will not normally decide questions that have become moot." *District of Columbia v. Grp. Ins. Admin.*, 633 A.2d 2, 12 (D.C. 1993). An event that "renders relief impossible or unnecessary"—even one that occurs while an appeal is pending—renders the appeal moot. *Vaughn v. United States*, 579 A.2d 170, 175 n.7 (D.C. 1990). "The burden of demonstrating that a case is moot falls heavily upon the party asserting it," however. *In re Morris*, 482 A.2d 369, 371 (D.C. 1984).

The government had ample opportunity and incentive to raise mootness earlier if it had a basis for this argument.[39] But the government has not presented this court with a sufficient factual foundation to support a determination of mootness.[40] Indeed, it has never presented a mootness argument to this court in

---

[39] As noted above, Mr. Bradley was required to seek review of his sentence by an Associate Judge of the Superior Court before he could appeal to this court, a process that took nine months. Thereafter, another thirteen months passed before the government filed its initial brief with this court.

[40] Even assuming Mr. Bradley has served his jail sentence, we have no record evidence that Mr. Bradley has paid his $2,000 worth of fines, and the government at oral argument acknowledged that it did not know if the fines had been paid. It has long been the rule in this jurisdiction that a criminal appeal becomes moot "when the judgment has been satisfied by the payment of a fine or the completion of the sentence." *Rosenau v. District of Columbia*, 147 A.2d 445, 446 (D.C. 1959); *see Hanback v. District of Columbia*, 35 A.2d 189, 190 (D.C.

(continued…)

writing.[41] Because the government has provided us with nothing to substantiate its claim of mootness, "we should be slow to rule that the appeal is moot, and we think it more wise and fair to proceed to decide the case on its merits." *See Davis v. District of Columbia*, 91 A.2d 14, 15 (D.C. 1952).

## III.   Conclusion

Because the magistrate judge relied on misinformation to sentence Mr. Bradley, misinformation derived from CourtView records the magistrate judge failed either to disclose to the parties or to make part of the record, we remand for resentencing.[42] Pursuant to our general supervisory authority, we also direct that the resentencing be conducted by a different judge. *See McPhaul v. United States*, 452 A.2d 371, 374 (D.C. 1982) (finding that, because actions by the trial court

---

(…continued)
1943); *see also M.A.P. v. Ryan*, 285 A.2d 310, 311-12 (D.C. 1971) (acknowledging that decisions of the Municipal Court of Appeals for the District of Columbia constitute binding precedent).

   [41] After raising mootness as an issue at oral argument, the government filed a supplemental brief with this court in which it made no mention of mootness.

   [42] In its supplemental brief to this court, the government argues that the trial court on remand may consider any new criminal conduct by Mr. Bradley post-dating his sentencing in this case. But this court does not possess any record information concerning further criminal activity and we decline to reach an issue not presented by the record before us.

were "inappropriate and could well raise constitutional questions[,]" the best course was "to remand the case, pursuant to our general supervisory authority, for resentencing before another judge") (internal citation omitted). We take this action because it is important for us to consider "the appearance of justice, as well as its reality." *See Thorne v. United States*, 46 A.3d 1085, 1093 (D.C. 2012) (internal quotation mark omitted).

*So ordered*.